IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ZAILEE C. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ZAILEE C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MIKAYLA S., APPELLANT.

Filed April 18, 2023.   Nos. A-22-614 through A-22-616.

Appeals from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Affirmed.

Brian J. Davis, of Davis Law, L.L.C., for appellant.

R. Garrett Goodwin, Deputy Dawson County Attorney, for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Mikayla S. appeals the order of the county court for Dawson County, sitting as a juvenile court, terminating her parental rights to her three children. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Mikayla is the mother of Zailee C., born in 2017, Adalynn C., born in 2019, and Braylen C., born in 2020. Austin C. is the father of all three children. The State terminated Austin's parental rights to the children in these same juvenile proceedings below. Because Austin is not part of this appeal, he will only be discussed as necessary.

On May 26, 2020, law enforcement placed Zailee and Adalynn (Braylen was not yet born) in an emergency hold based on concerns that Mikayla and Austin were not following a voluntary case plan with the Nebraska Department of Health and Human Services (DHHS), Austin had left Nebraska, and Mikayla left the house for work and did not provide proper supervision for the children. On May 27, the juvenile court entered an ex parte order placing Zailee and Adalynn in the temporary custody of DHHS. They have remained in the custody of DHHS and in foster care placement ever since.

On May 28, 2020, the State filed a petition in the juvenile court alleging that Zailee and Adalynn were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of their parent; their parent refused to provide them proper or necessary subsistence, education, or other care necessary for their health, morals, or well-being; or they were in a situation dangerous to life or limb or injurious to their health or morals. On June 3, Zailee and Adalynn were adjudicated to be children within the meaning of § 43-247(3)(a) based on their parents' no contest pleas to the allegations in the petition.

Following a disposition hearing on July 22, 2020, the juvenile court approved and adopted the recommended case plan goals, and ordered that:

1. [The parents] will address the concerns of substance abuse and will refrain from any illegal drug usage as evidenced by scheduling and completing a drug/alcohol evaluation, following any and all recommendations from that evaluation and submitting to random drug testing if clinically recommended.

2. [The parents] will ensure they are meeting their own mental health needs as evidenced by completing and following the recommendations of a mental health evaluation, establishing coping skills, working on better techniques to remain calm when parenting, addressing anger/violence, and developing a positive support system.

3. [The parents] will be able to meet the basic needs of the children as evidenced by obtaining and maintaining legal employment, maintaining stable and appropriate housing, and developing and following a budget.

4. [The parents] will improve their parenting skills as evidenced by participating in family support services and visitation as scheduled, providing age appropriate supervision during visitation, identifying appropriate consequences and rewards for the children, understanding and providing for the developmental needs of the children, and showing consistency in expectations and routine.

5. [The parents] will maintain a safe living environment as evidenced by developing protective parenting factors, addressing the violence in the home, and arranging appropriate daycare for the children.

The goals remained the same throughout the life of these cases.

On December 3, 2020, the day after Braylen's birth, the State filed a petition alleging that he was a child within the meaning of § 43-247(3)(a) for the same reasons as Zailee and Adalynn. That same day, the juvenile court entered an ex parte order placing Braylen in the temporary custody of DHHS, and he has remained in the custody of DHHS and in foster care placement ever since. On December 30, the State filed an amended petition alleging that Braylen was a child

within the meaning of § 43-247(3)(a) because he was "homeless or destitute, or without proper support through no fault of his parents." That same day, Braylen was adjudicated to be a child within the meaning of § 43-247(3)(a) based on Mikayla's admissions. The juvenile court approved and adopted the same case plan goals for the parents as in Zailee and Adalynn's cases.

On November 2, 2021, the State filed a motion to terminate Mikayla's parental rights to Zailee, Adalynn, and Braylen pursuant to Neb. Rev. Stat. § 43-292(4), (6), and (9) (Reissue 2016); it also sought to terminate Mikayla's parental rights to Zailee and Adalynn pursuant to § 43-292(7). The motion alleged that: Mikayla was unfit by reason of habitual use of intoxicating liquor or narcotic drugs, which conduct was seriously detrimental to the health, morals, or well-being of the children; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); Zailee and Adalynn had been in an out-of-home placement for 15 or more months of the most recent 22 months; Mikayla subjected the children to aggravated circumstances, including, but not limited to abandonment in that she left Nebraska in July or August 2021 and was believed to reside in New Mexico; and termination of Mikayla's parental rights was in the best interests of the children.

On April 13, 2022, the State filed an amended motion to terminate Mikayla's parental rights, wherein it also sought to terminate Mikayla's parental rights to Braylen pursuant to § 43-292(7) because he had now been in an out-of-home placement for 15 or more months of the most recent 22 months. The amended motion also noted that Mikayla had returned to Nebraska on or about March 23.

TERMINATION HEARING

The trial was originally scheduled to be held on April 13, 2022, but was continued that day because Mikayla had been hospitalized. Trial was ultimately held on May 2, 2022. The State called several witnesses to testify, and numerous exhibits were received into evidence. Mikayla did not testify, nor did she call anyone to testify on her behalf.

Victoria McDonald, an initial assessment worker with DHHS, testified that DHHS received an intake for this family on April 13, 2020, when Zailee was 2 years old, and Adalynn was 7 months old; Braylen was not yet born. According to DHHS court reports received into evidence, the intake reporter was concerned about the physical neglect of Zailee and Adalynn by their parents because Mikayla was leaving the young children with Austin while she went to work despite him being regularly intoxicated to the point of passing out. The reporter was also concerned about fighting between Mikayla and Austin that sometimes was physical and violent. McDonald stated that she subsequently learned that the family had moved to Nebraska in February, and prior to that they had been working a non-court or voluntary case in Arkansas because there were concerns about Austin's alcohol use, and he had received a DUI with the children in the car.

McDonald first had contact with the family on April 20, 2020. The night before, Austin had been arrested for domestic violence, but those charges were dropped. When McDonald met with the family, Mikayla and Austin admitted to arguing frequently and that law enforcement had been called to their home numerous times. Austin also admitted to being intoxicated while caring for the children and that alcohol was a problem for him. Austin's parents were going to take him "back to Arkansas to complete treatment." McDonald "safety planned with the family," asking that Austin not consume alcohol while caring for the children and that the family address domestic

violence. It was agreed that it would be a voluntary, "non-court" case. Intensive family preservation began working with the family on April 30, "so a therapist was coming into the home" approximately 6 hours a week.

McDonald testified that Zailee and Adalynn were removed from the home on May 26, 2020. Austin had gone back to Arkansas to stay with his parents until he could locate a treatment center. Mikayla left for work and left the children with the intensive family preservation therapist, telling the therapist to call her sister to come get the children. However, Mikayla's sister was not willing to have the children. McDonald stated, "So at that time, [the children] did not have a caregiver because . . . that wasn't . . . in [the therapist's] job description." When asked if the therapist told Mikayla as much, McDonald replied, "I believe so." McDonald stated there were also concerns that Zailee had a bite mark on her arm, and Mikayla later admitted to biting Zailee because it was something that her mother told her would work if Zailee was biting other children. McDonald did not have much involvement in the case after May 26, and she transferred the case on June 2.

Amanda Daily testified that she became the case manager for this family on June 2, 2020. When Daily first took over the case, there were no significant substance abuse concerns regarding Mikayla, but drug testing was ordered by the court. Mikayla participated with drug patch testing, but there were "several patches that were tampered or lost." After some discussion, Mikayla started to comply with patch testing around September and tested negative until October when testing was discontinued "with the understanding that if there were any . . . substance abuse concerns with the department, we'd put the patch back on." Mikayla also completed her court-ordered drug and alcohol evaluation.

During Daily's first week on the case, law enforcement had to be called to Mikayla and Austin's home 12 times in 3 days; Austin had returned to Nebraska on an unspecified date. According to DHHS reports, the numerous law enforcement calls were due to fighting between Mikayla and Austin.

Daily stated that Mikayla and Austin had supervised visitation. There were "a lot of concerns of emotional abuse, specifically because the children were present during the fighting" between Mikayla and Austin. Sometimes Zailee was "caught in the middle" and would tell her parents to stop fighting. Zailee would also repeat things she heard and internalized, and would tell Austin that he needed to leave, he needed to move, and that he needed to leave their family alone. According to Daily, "At one point Zailee had said that 'It's my fault that Mommy is so mad. It's scary.'" Visitation was stopped for approximately a week in July 2020 because of fighting between the parents, and then visitation was separated for approximately 2 weeks. However, the parents wanted to have visits together, so ground rules were created: if law enforcement was to be called, the visit would terminate; if there were any illegal substances or drinking during the visits, that visit would end; if there was any fighting or bickering between the parents, the provider would step in and give them warnings and if they did not stop after two warnings, the visits would end. In August, two family support workers had to be present at all visits because of the hostility from the parents towards the workers.

Daily stated that Mikayla and Austin were offered "parent/child interactive therapy" beginning in October 2020 to work on understanding Zailee's emotional needs and to work on

parenting skills. However, Mikayla and Austin did not consistently participate in sessions, so the therapist, Jason Dillard, discontinued that service.

Dillard is a licensed independent mental health practitioner who focuses on childhood trauma and adolescent behaviors. He is certified in child-parent psychotherapy and parent-child interactive therapy. Dillard testified that he provided child-parent psychotherapy for Zailee and both of her parents. He said that for this type of therapy, it is important to be consistent and that it should occur weekly, at the very least. However, there were only eight sessions from September 2020 through February 2021, six sessions with Zailee and her parents, and two sessions only with the parents; according to DHHS reports, Dillard had offered 14 sessions. Dillard stated that Zailee was consistently available for sessions, but her parents were not consistently available. Dillard never saw Zailee individually.

Dillard initially met with Mikayla and Austin at the end of September 2020 to do "a consultation or parent feedback session to describe the type of counseling, what is the parents' intention with the counseling . . . and what the issues are, where they were seen." In November, Dillard was able to complete the assessments with both Mikayla and Austin, but then he did not hear back from them until mid-December. Dillard stated,

> Now, like I said before, this type of counseling, it's important to be consistent and very often weekly, at the very least. And we had already gotten two and a half months in and we only had four sessions completed. So I saw them in the middle of December and then I didn't see them again until January, and the December and January sessions were completely different because Austin . . . had left. There had been charges that had been filed between both parents. They had significant discord, and so the direction of treatment had changed significantly, even only having three sessions under my belt.

Dillard said that assessment was difficult because of the inconsistency, but it "pretty much came down to the fact that there were definitely some concerns with instability in the home." Dillard stated,

> Zailee struggled to process difficult feelings and emotions, she became overwhelmed at times, and when she did, it was very significant. She would become physical, she became violent at times, which she had just turned three when I started seeing her.
>
> You know, throwing things, hitting, kicking is sometimes common for kids at that age, but this was beyond. She had behaviors where she would bite to the point of drawing blood, she would scratch, she would close fist hit and open -- open hand slap on the cheek kind of stuff.
>
> We were working on trying to understand where those behaviors were coming from and how to help her process them.

Dillard diagnosed Zailee with an adjustment disorder with disturbance of conduct. Dillard said, "It was evident that Zailee struggled understanding feelings and emotions because she was only ever given attention when there was something wrong." Dillard recalled recommending in January 2021 that Mikayla's visitation be reduced because Zailee was becoming retraumatized based on the

frequency and content of the visits. Case manager Daily stated that visitation was reduced "a little bit, but not a drastic reduction."

Dillard was unable to develop treatment goals to address Zailee's condition and symptoms because the treatment goals would have involved her parents. Dillard stated, "[W]e got to the end of the foundation phase and it was recommended that Zailee would benefit from counseling, but there were too many barriers with mom's mental health in addition to dad being out of the state at that point." The last session was on February 10, 2021, with a recommendation to follow up in 1 week. However, at the team meeting in March, Dillard recommended that parent-child psychotherapy would not be beneficial until the needs of both parents were met so that they could be consistent; there were "immediate concerns of mental health with [Mikayla] and consistency . . . with the sessions needed to be addressed." When Dillard discontinued services, Zailee still needed counseling to help her process some of the things that she had experienced up until she entered foster care; both Mikayla and Austin admitted that Zailee had witnessed fights between them.

Dillard testified that at the end of March or in April 2021, he and his wife were asked to become foster parents for Zailee, Adalynn, and Braylen. They served as the children's foster parents for 78 days, from May 20 to August 6, 2021.

Case manager Daily testified that Mikayla completed a mental health evaluation wherein she was diagnosed with depression and anxiety, and outpatient counseling services were recommended. Mikayla said she was not crazy and did not need mental health services, but after "a lot of team meetings and discussions," Mikayla started to minimally participate. According to a DHHS court report, she completed one session with her therapist in September 2020. Daily testified that Mikayla had "a lot of no shows" and attended only four sessions with her therapist.

According to Daily, Braylen was born in December 2020 and was removed from his parents' care within a day of his birth; he had never lived with either of his parents. Braylen was removed based on concerns with the open, ongoing case. She said, "There were significant concerns of substance use, specifically alcohol use by [Austin], significant concerns with domestic violence between [Austin] and [Mikayla] with multiple law enforcement contacts," and there were concerns about the parents' mental health. After Braylen's birth, Mikayla had semi-supervised visits, but that only lasted for "a couple of weeks." Daily stated that there were two concerning physical incidents during visitation after Braylen's birth where Mikayla spanked and slapped Zailee. According to a DHHS report, Mikayla spanked Zailee on January 4, 2021, "leaving a red mark for over an hour," and then she "slapped Zailee in the car when Zailee was hitting her" on January 6; additionally, Mikayla "drew a mustache on Braylen with a marker" on January 15, when he was only 1 month old. Daily testified that visits resumed being fully supervised.

When asked if there were any instances of domestic violence between Mikayla and Austin while she was on the case, Daily said "[y]es," and explained that "[m]ost of them were just fighting and arguing" and she got that information from the police department. Daily stated that "Austin had indicated at one point that Mikayla was trying to kill him with a knife," and Mikayla reported at one point that Austin locked her out of the home. Daily said "[t]here were several other times of them just fighting and arguing over the bills in the home; that I believe that calls were made from other people in the apartment complex, so law enforcement was called to settle things down."

There was another incident at the end of December 2020 or at the beginning of 2021 when Mikayla was arrested for domestic assault. Daily stated,

> When I spoke with [Austin] he had indicated that [Mikayla] had come home, that she was very upset, screaming, yelling; that he hadn't seen her that way before. He was very concerned. That she had tried to hit him, that she had kicked the dog or hit the dog and that there was [sic] holes punched in the wall, and that was the reason why he decided to leave the State of Nebraska and he moved to Arkansas [on January 3, 2021].

Exhibits received into evidence show that on March 16, 2021, Mikayla pled no contest to "Dom asslt-intl cause body injury/int" and "Cruelly mistreat animal-1st offense," both class I misdemeanors, and a "[p]resentence" was ordered. Charges of terroristic threats, obstructing a peace officer, and criminal mischief were dismissed on the motion of the prosecutor. According to DHHS court reports received into evidence, after Mikayla failed to show up for her "IDI" appointments with probation in April, her bond was revoked, and a warrant was issued for her arrest; she later advised DHHS that she would turn herself in on May 20.

Daily testified that after Austin left for Arkansas, Mikayla's visitation was challenging. "She was definitely overwhelmed with losing her job [in December 2020], having three children and not having anybody to help her during the visits. . . . She was feeling overwhelmed." Mikayla had mood swings where she would be angry at the family support workers and did not want their advice. Mikayla's depression and anxiety "got out of control, to the point where she had to have another mental health evaluation in February of 2021," and she was prescribed medications at that time.

Also in February 2021, Daily received several reports from the family support workers and Mikayla's family that Mikayla said she planned "to kill [Daily] in the toy room, and then after she killed me, she was going to kill herself"; at that point visits were moved from the family home to a community setting. Daily testified that between October 2020 up until she stopped being the caseworker on April 29, 2021, Mikayla made numerous threats "either towards family support workers, towards myself, towards attorneys on the team or towards the Judge."

Daily stated that after Mikayla lost her job in December 2020, employment was "hit or miss and it was difficult for her to sustain any kind of employment to meet the children's needs." Mikayla was "very aggressive" towards family support workers and did not want to work with them, insisting on doing her own budgeting. However, during visits she would complain about not having money, but then would spend money on "fancy toys for the kids or fancy clothes for the kids or different pets." Housing was maintained, but it was not stable because of the domestic violence and aggression between the parents.

During her time on the case, Daily believed that it was unsafe for the children to return to Mikayla, and she believed it was in the children's best interests to terminate Mikayla's parental rights.

According to DHHS court reports received into evidence, Mikayla was authorized to have fully supervised visitation with the children from January to May 2021, however numerous visits were cancelled or ended early. There continued to be concerns about Mikayla's ability to parent the children and provide adequate care for them. There were also concerns about Mikayla's behavior towards the children. Visitations had to end early due to Mikayla screaming and yelling

or making threats to the providers. On March 27, Mikayla decided to suspend visits because she was not happy with the provider and wanted a new provider. After visits resumed on April 9, Mikayla canceled or ended half of her visits early, including one visit she canceled on April 30 by texting the provider at 2:30 a.m. to let them know she was almost to Arkansas and would not be able to have her visit that day. On May 3, DHHS became aware that Mikayla had an active warrant that she was not willing to take care of until May 20; DHHS suspended her visits during that time because they were not willing to risk having her arrested in front of the children. The DHHS reports also note that Mikayla missed several counseling appointments in March, and there were ongoing concerns about her consistency in taking prescribed medication and canceling appointments for medication management.

Chantelle Reicks was the DHHS permanency worker assigned to this case from April or May 2021 until April 2022. When Reicks took over the case, Mikayla had supervised visits which were moved back to her home shortly thereafter. Mikayla participated in visits, but there were concerns about her discipline of the children, general supervision, and age-appropriate activities. There was one incident where Mikayla locked Zailee in the bathroom for a timeout and it was reported that Zailee was screaming and begging to be let out and Mikayla continued to hold the door shut.

Reicks stated that Mikayla "was employed in one form or another" from April to August 2021. Mikayla had also been attending therapy but was not making progress. Additionally, Mikayla had resumed drug testing shortly before Reicks took over the case; she had a positive patch for cocaine in May and THC in July, and a couple other patches that were either removed or not able to be collected; no patches were placed after July 9.

Reicks testified that Mikayla left Nebraska in August 2021 after which her whereabouts were not always known. Mikayla did not tell Reicks that she was leaving the state. A family support worker told Reicks that when the worker contacted Mikayla about a drug patch, she told them she was living in New Mexico. During Mikayla's absence from Nebraska, Reicks had reports of her living in New Mexico, Oklahoma, Arkansas, and Colorado. According to DHHS court reports, in August 2021 it was discovered that Mikayla was in jail in Oklahoma on charges of possession of drug paraphernalia and possession of medical marijuana without a license; she was released from jail on August 10. The DHHS reports also state that in September and October, Mikayla reached out to DHHS three times indicating she wanted to relinquish her parental rights, but in October she also requested visitation with the children.

Reicks testified that Mikayla's absence from the state posed a barrier to her ability to work on any kind of case plan. From August to September 2021 Mikayla did not have any visitation. In September, DHHS started to arrange video visitation, and Mikayla had at least one video visit before visits were suspended at the recommendation of Zailee's counselor; Zailee's behaviors were tied to Austin's visitation, but Zailee's therapist recommended that all visitations stop so that Zailee could stabilize and start working on her trauma. Mikayla did not want the video visits to stop, but Reicks said the court left it at the discretion of DHHS and the guardian ad litem. Reicks stated that in October, Mikayla "texted me that she was going to kill me" after Reicks missed 12 phone calls and text messages in one morning while in meetings.

According to DHHS court reports, on November 5, 2021, DHHS received an email from Mikayla's attorney indicating that Mikayla wanted to relinquish her parental rights and provided

contact information in New Mexico; DHHS reached out but did not receive a response. On November 29, DHHS was notified by Mikayla's family that she had moved to Arkansas and was living with Austin. In December, DHHS was notified that Mikayla and Austin had a physical altercation and Mikayla was no longer staying with him; "It was reported Mikayla had attempted to run Austin over with her car. . . . Mikayla's family then reported Mikayla was living with '[a] dope head druggie/dealer . . . now.'" In February 2022, DHHS was notified by Mikayla's family that she was in Colorado. Mikayla's family also reported that she had broken into her mother's house in Colorado and her sister's house in New Mexico and stolen multiple items and that she had multiple felony warrants due to her actions. In March, Mikayla's family notified DHHS that she was incarcerated in Oklahoma; on March 21, Mikayla spoke to DHHS and indicated that she had just finished spending 30 days in jail in Oklahoma and was now back in Nebraska, finally coming out of her depression, and wanted to work on reunification. The DHHS report states, "Mikayla had active warrants in Lincoln (Failure to Appear on Speeding Ticket), Custer (DUI), and Dawson County (Domestic Assault/Probation Violation)," "Mikayla indicated she had court again in Oklahoma on March 24, 2022 and then her charges in Oklahoma would be taken care of," and she stated that she had warrants in Colorado and New Mexico but was working to collect evidence to fight those charges. On March 20, "Mikayla was arrested for her outstanding warrants" but bonded out of jail that same day, and her warrants in Nebraska were cancelled after her stay in jail. She was scheduled for court on April 12 in Dawson County for her probation violation hearing.

When Reicks spoke with Mikayla on the phone in March 2022, Mikayla told her about the felony charges in Colorado and that she had "some stuff in New Mexico" that she was working out. Mikayla wanted to continue working on the case and get her children back. Mikayla asked about visitation, but Zailee's therapist was not comfortable with starting visitations and wanted Mikayla to participate in some sessions with the therapist first. Mikayla reported to Reicks that she wanted to go to inpatient treatment for her mental health. During the week of April 13th, Reicks learned that Mikayla had been hospitalized after a possible overdose on her medications. Reicks believed that it was unsafe for the children to return to Mikayla and that it was in the children's best interests to terminate Mikayla's parental rights.

Jessica Schlegelmilch is a mental health clinician and is trained in child-parent psychotherapy. Schlegelmilch testified that a licensed independent mental health clinician in her office initially did an intake at the beginning of September 2021 and diagnosed Zailee with specified trauma and stressor related disorder. That clinician recommended that Zailee not have visits based on the information from the intake and the level of dysregulation that Zailee was experiencing. Schlegelmilch had no knowledge of when Zailee last had contact with Mikayla.

Schlegelmilch started working with Zailee at the end of September 2021 and they met weekly. Zailee presented with difficulties with her attachment to the caregiver and struggled with "violent and aggressive behaviors, difficulty with experiencing an age typical range of emotions, difficulty communicating her thoughts and feelings in an age typical way." Schlegelmilch opined that a lack of stability affected Zailee in this case and there was evidence that she was exposed to an environment where domestic violence was present during her development. According to Schlegelmilch, a lack of stability for a child can lead to higher levels of anxiety, depression, and difficulties with forming and maintaining meaningful relationships.

Schlegelmilch testified that Zailee had made progress and allowed her foster parents to support her when she's feeling overwhelmed or upset with something, could communicate her emotions and feelings in a more age typical manner, and could be redirected in moments when she's having some aggressive or emotional dysregulation. Schlegelmilch stated that "Zailee needs parents who are able to offer therapeutic parenting strategies which would be consistent, predictable, attuned parenting to . . . meet her emotional and physical needs."

Schlegelmilch testified that Mikayla did reach out to her at the beginning of April 2022 hoping to resume some visits with the children. Schlegelmilch and Mikayla had one tele-health session. Schlegelmilch said,

[W]hen I talked to [Mikayla], I let her know that really the work in [child-parent psychotherapy] for her and I would be to have some parent-only sessions to really assess . . . her ability to step into some of that work. And part of that work is addressing her own mental health needs, which would be collaboration between her therapist and myself . . . to ensure that Mikayla's [sic] in a place where she would be able to step into that process.

Schlegelmilch also wanted to coordinate and collaborate with Mikayla's therapist to establish her ability to be safe and appropriate before beginning child-parent psychotherapy. When Schlegelmilch and Mikayla spoke, Mikayla said that she did not have a therapist she was currently working with. Schlegelmilch did not believe that it was in Zailee's best interest to proceed with child-parent psychotherapy with Mikayla at that time.

Paige Peterson, a permanency worker with DHHS, was assigned to this case on April 13, 2022. Peterson learned that Mikayla had been hospitalized the week prior after her attorney requested a continuance for the termination hearing that was scheduled for April 13. Peterson spoke to Mikayla the following week about what led to her hospitalization. Peterson said, "[Mikayla] had stated that it was an overdose; that she was attempting suicide; that her purpose is to be a mother, and if she can't be a mother, she wasn't going to be here." Mikayla did not have any visitation with the children during Peterson's time on the case. Peterson believed that it was in the children's best interests to terminate Mikayla's parental rights.

JUVENILE COURT'S DECISION

In a journal entry and order entered on July 14, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Mikayla's parental rights existed pursuant to § 43-292(6) and (7); however, the court found that § 43-292(4) (habitual use of intoxicating liquor or drugs) and (9) (aggravated circumstances) had not been proven by clear and convincing evidence. The court also found that Mikayla was an unfit parent, and that termination of her parental rights was in the children's best interests. Accordingly, the court terminated Mikayla's parental rights to Zailee, Adalynn, and Braylen.

Mikayla appeals.

ASSIGNMENTS OF ERROR

Mikayla assigns that the juvenile court erred in finding that (1) the State proved by clear and convincing evidence that reasonable efforts to preserve and reunify the family were made and

failed to correct the conditions leading to the removal of the children, and (2) she was an unfit parent and termination of her parental rights was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Mikayla's parental rights to Zailee, Adalynn, and Braylen under § 43-292(4), (6), (7), and (9). The juvenile court found that two of those grounds, § 43-292(6) and (7) existed by clear and convincing evidence. Mikayla challenges the court's finding under § 43-292(6), claiming that reasonable efforts were not made to reunify the family, and despite the lack of reasonable efforts, she did make progress. Mikayla acknowledges that § 43-292(7) had been proven.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Zailee and Adalynn were removed from Mikayla's care on May 26, 2020, and Braylen was removed on December 3, 2020. All three children remained out of the home through at least May 2, 2022, when the termination hearing was held. At the time of the termination hearing, Zailee and Adalynn had been in an out-of-home placement for 23 months, and Braylen had been in an out-of-home placement for one day shy of 17 months. The 15-out-of-22 months period was clearly satisfied for all three children.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Mikayla to the three children. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn*

*C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Mikayla argues that she "may have some intense work to do, but she has shown the ability and willingness to rehabilitate herself early in the case, in the middle of the case, and at the end of the case after her return to Nebraska." Brief for appellant at 27. Mikayla notes that she participated in intensive preservation services at the beginning of the case, completed a drug and alcohol evaluation in September 2020, agreed to drug testing, completed a mental health evaluation and attended four counseling sessions, participated in a parenting class, participated in child-parent psychotherapy sessions with Dillard, was employed or seeking employment throughout the case, and expressed to Schlegelmilch in April 2022 her intention to address her mental health needs because of a desire to reunify with her children. Despite Mikayla's claims of progress throughout the case, the record reveals her progress was periodic. When viewed in light of the entire case, Mikayla's progress was not persuasive enough to allow her to continue working towards reunification, rather than having her parental rights terminated.

Notably, there were repeated incidents of domestic violence between the parents, and Mikayla made threats against various people, including case workers and family support workers attempting to assist her in reuniting with her children. Mikayla only attended 8 out of the 14 sessions of child-parent psychotherapy for Zailee, who had endured significant trauma. And Mikayla did not address her own mental health in a meaningful way. Mikayla's visits with the children were inconsistent and concerning behaviors were noted during visits. Mikayla has not had in-person visitation with the children since July 2021, and has not had a virtual visit since September. She left Nebraska for several months, during which time she was unable to work on her case plan goals and during which time she had arrests and warrants in multiple states. She returned to Nebraska in March 2022, just weeks before the termination of parental rights trial was set to be heard in April, and that trial date had to be continued due to Mikayla's hospitalization for a suicide attempt. The various witnesses testified that it was not safe for the children to be returned to Mikayla and that it was in the children's best interests for Mikayla's parental rights to be terminated.

At the time of the termination hearing, Zailee and Adalynn had been in an out-of-home placement for 23 months, and Braylen had been in an out-of-home placement for approximately 17 months. As noted by the juvenile court, Mikayla is "far from ready for reunification with the children, and the evidence shows that it would be a long time, if ever, before [she] has made sufficient improvement to allow for reunification." "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274

Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Mikayla was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Mikayla's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court terminating Mikayla's parental rights to Zailee, Adalynn, and Braylen.

AFFIRMED.